| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | <u>NOT FOR PUBLICATION</u> |
|---|---|
| TRUSTEES OF THE PLUMBERS LOCAL UNION NO. 1 WELFARE FUND, ADDITIONAL SECURITY BENEFIT FUND, VACATION & HOLIDAY FUND, TRADE EDUCATION FUND, AND 401(K) SAVINGS PLAN,<br><br>                      Plaintiffs,<br><br>    – against –<br><br>BASS PLUMBING & HEATING CORP. AND ROBERT FIDUCCIA,<br><br>                      Defendants. | <u>MEMORANDUM & ORDER</u><br><br>13-CV-06797 (ERK) (VMS) |

KORMAN, *J.*:

## I. BACKGROUND

Plaintiffs Trustees of the Plumbers Local Union No. 1 Welfare Fund, Additional Security Benefit Fund, Vacation & Holiday Fund, Trade Education Fund, 401(K) Savings Plan ("the Funds"), are employer and employee trustees of multiemployer labor-management trust funds organized and operated in accordance with ERISA. Pls.' Rule 56.1 Statement ¶ 1, ECF 31. Plumbers Local Union No. 1 ("the Union") is a labor organization that represents employees in an industry affecting commerce, 29 U.S.C. § 142(1), and is the certified bargaining representative for certain employees of defendant Bass Plumbing & Heating Corp. ("Bass"), Pls.' Rule 56.1 Statement ¶ 2. Defendant Robert Fiduccia is the president and sole shareholder of Bass. Fiduccia Aff. ¶ 1, ECF 33. In 2005, Bass became a member of the Association of Contracting Plumbers of the City of New York ("the ACP"). Pls.' Rule 56.1 Statement ¶ 3; Epstein Decl. Ex. A, ECF 29.

Plaintiffs commenced this action against Bass and Fiduccia seeking unpaid fringe benefit contributions from the periods of April 2013 to May 2013, and July 2013 to April 2014, pursuant to two collective bargaining agreements. Am. Comp. ¶¶ 7-11, ECF 19. Both agreements were negotiated and executed by the Union and by the ACP on behalf of its members. Epstein Decl. Ex. B, at 1; *id.* at Ex. C, at 2. The first contract ("Agreement 1") covers the period from July 1, 2012, to June 30, 2016, and details the terms and conditions for certain plumbing work within the City of New York. *Id.* at Ex. B, at Art. 27. The second contract ("MES Agreement") covers the period from October 1, 2013, to September 30, 2016, and details the terms and conditions for certain mechanical equipment servicing work within the City of New York. *Id.* at Ex C, at Art. I § 2. Both agreements require employers to remit contributions to the Funds for all hours of covered work performed by their employees, *id.* at Ex. B, at Art. 2; *id.* at Ex. C, at Art. II. In addition, both provide that "[a]ny entity wishing to abrogate this Agreement must notify both the Association and the Union in writing by regular and express delivery mail a minimum of one hundred and eighty (180) days prior to the expiration date of this Agreement." *Id.* at Ex. B, at Art. 27; *id.* at Ex. C, at Art. XVI.

The ACP terminated Bass's membership on October 22, 2013. Thompson Decl. Ex. A, ECF 32. Defendants assert that they did not consent to this termination. *See* Fiduccia Aff. ¶ 5. The only notice of this event that plaintiffs received was a letter sent to the Union by the ACP, dated October 22, 2013, which stated: "Effective immediately the membership of [Bass Plumbing & Heating Corp.] has been terminated." *Id.* Plaintiffs allege, and defendants do not contest, that defendants did not at any point contact the Union to discuss either their expulsion from the ACP or the significance of the termination, if any, for their obligations under

Agreement 1 or the MES Agreement (collectively, "the Agreements"). *See* Pls.' Summ. J. Br. 4, ECF 30.

Defendants argue that their termination from the ACP ended any obligation to contribute to the Funds pursuant to the Agreements. Defs.' Opp'n Br. 3, ECF 34. Defendants also assert that "[t]his termination cannot be claimed as a surprise or to in anyway prejudice the Plaintiff as they were aware of this possibility." Fiduccia Aff. ¶ 5. In support of this assertion, defendants provide a letter signed by the Union's Business Manager on June 22, 2012—before either of the Agreements took effect, and over a year before Bass's termination—instructing union employees working for Bass to terminate their employment immediately in light of Bass's "delinquent fringe benefit payments and improper bonding." Thompson Decl. Ex. B. Plaintiffs claim that Defendants remained bound by the Agreements even after their ACP membership was terminated, both because defendants failed to properly communicate their intent to abrogate the Agreements and because defendants manifested an intent to remain bound by the Agreements. Pls.' Summ. J. Br. 4-10.

Because resolution of this question has "prevented the parties from being able to engage in meaningful settlement discussions," and "will have [a] profound impact on the volume of discovery necessary" to determine any damages, Letter from Plaintiffs, Aug. 22, 2014, ECF 23, Judge Vera M. Scanlon authorized the parties to seek partial summary judgment on the question of liability, *see* Scheduling Order, Aug. 6, 2014. Plaintiffs accordingly move for summary judgment on the questions of: (1) whether defendant Bass is liable for unpaid benefit contributions both prior and subsequent to Bass' expulsion from the ACP; and (2) whether defendant Fiduccia is a fiduciary of the Funds and therefore personally liable for any delinquent contributions. *See* Pls.' Summ. J. Br. 13.

## II. DISCUSSION

1. **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Nevertheless, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *Anderson*, 477 U.S. at 256.

2. **Notification of Intent**

Defendants do not dispute that Bass was bound by the Agreements' terms and conditions while a member of the ACP. *See* Defs.' Opp'n Br. 2-3 (arguing that Bass was "no longer" bound by the Agreements after being terminated from the ACP). Indeed, it is apparent from the face of the contracts that, as a member of the ACP at the time the Agreements were executed, Bass was bound by their terms. *See* Epstein Decl. Ex. B, at 1 ("AN AGREEMENT made and entered into by and between the [ACP] on its own behalf and on behalf of its members at the time of the execution thereof . . . ."); *id.* at Ex. C, at 2. Defendants also do not dispute that they did not "notify both the Association and the Union in writing by regular and express delivery mail" of their intent to abrogate the Agreements, as required under the termination clauses of both Agreements. *See id.* at Ex. B, at Art. 27; *id.* at Ex. C, at Art. XVI. Because defendants did not

adhere to the express termination requirements of the Agreements, their contractual obligations remain in place. *See Sheet Metal Workers Int'l Ass'n, Local 104 v. Simpson Sheet Metal, Inc.*, 954 F.2d 554, 555 (9th Cir. 1992) ("Unambiguous terms in labor agreements are strictly enforced." (citation omitted)).

As a matter of law, Bass also failed to provide the Unions with adequate notice of its intent to withdraw from the Agreements. Notice of withdrawal from a collective bargaining unit must be unequivocal. *Publishers' Ass'n of N.Y.C. v. N. L. R. B.*, 364 F.2d 293, 295 (2d Cir. 1966) (citing *Retail Associates, Inc.*, 120 N.L.R.B. 388 (1958)). Notice is "unequivocal" only if it is "unambiguous." *Dow Elec., Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 910*, 500 F. Supp. 2d 148, 154-55 (N.D.N.Y. 2007) (citing *Haas Elec., Inc. v. N.L.R.B.*, 299 F.3d 23, 27-28 (1st Cir. 2002)), *aff'd*, 283 F. App'x 841 (2d Cir. 2008). "Communication of withdrawal made to the multiemployer association"—here, the ACP—"does not qualify as clear, unequivocal notice to the union, even if it appears that the union was informally made aware of the withdrawal." *Chartier v. Parkoff*, No. 96 CIV. 0541 RWS, 1997 WL 599390, at *3 (S.D.N.Y. Sept. 26, 1997) (citing *Trustees of the UIU Health & Welfare Fund v. N.Y. Flame Proofing Co., Inc.*, 828 F.2d 79, 84 (2d Cir. 1987); other citations omitted). Because defendants communicated nothing to the Union about either their termination from the ACP or their desire to abrogate the Agreements, they did not provide adequate notice. *See id.* Moreover, even if a letter from a multiemployer association to a union could be considered a proper form of notice of an employer's withdrawal from the bargaining unit, the ACP's one-sentence notification that Bass's membership had been terminated falls short of the standard for "unequivocal" notice of withdrawal from the Agreements. *See* Thompson Decl. Ex. A. The letter neither states that Bass is withdrawing negotiating authority from the ACP, nor that Bass is abrogating its existing contracts. *See Tile*

5

*Setters & Tile Finishers Union of N.Y. & N.J. v. Speedwell Design/BFK Enter., LLC*, No. 06-CV-5211(KAM), 2009 WL 922021, at *9 (E.D.N.Y. Mar. 31, 2009) (explaining that withdrawal of membership from a multiemployer association and withdrawal of negotiating authority from the association are distinct) (citing *Dow Electric*, 283 F. App'x at 842). Defendants' position is particularly unpersuasive given the simplicity of this notice requirement. *See R.W. Granger & Sons, Inc. v. E. Mass. Carpenters & Carpenters Local 275 of United Bhd. of Carpenters & Joiners of Am.*, 686 F. Supp. 22, 26-7 (D. Mass. 1988) ("The rules for withdrawal from a multi-employer unit are well known. Compliance is not difficult.").

The June 22, 2012, letter submitted by defendants as evidence of the Union's actual knowledge of Bass's withdrawal from the Agreements is immaterial, as its date precedes the effective date of either of the Agreements. *See* Thompson Decl. Ex. B. The letter also does not raise a genuine issue as to whether Bass employed Union members during the relevant time period, since defendant Fiduccia concedes that Bass continued to employ Union employees until February 28, 2014. *See* Fiduccia Aff. ¶ 7. A letter from Union leadership discussing past contract violations by Bass has no bearing on the instant dispute. In addition, even if it were written during the relevant time period, an internal Union letter discussing an apparent breach of contract by defendants would not constitute formal notice of withdrawal from the collective bargaining agreements.

Defendants make much of the fact that their withdrawal from the ACP was involuntary. *See* Defs.' Opp'n Br. 2-3. However, this is a distinction without a difference—as evidenced by defendants' inability to cite any case law in support of their argument. *See N.L.R.B. v. Paskesz*, 405 F.2d 1201, 1202-03 (2d Cir. 1969) (affirming the Board's refusal "to recognize any significant distinction between . . . a suspension [from the multiemployer bargaining unit] and a

voluntary withdrawal."). The rationale underlying the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act is instructive here. As the Ninth Circuit has explained: "[M]any, if not most, employer withdrawals are involuntary to some degree, but no appellate court has found that factor relevant. Withdrawal liability attaches, not as a punishment for the employer's malice or willfulness in withdrawing from the plan, but to protect the vested pension interests of the employees." *Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1407 (9th Cir. 1984) (citations omitted). Similarly, whether Bass's withdrawal from the ACP was voluntary or involuntary, the impact on the Union is the same. That Bass was terminated from the ACP instead of voluntarily withdrawing has no bearing on the applicability of the notification requirements.

### 3. Manifestation of Intent

Plaintiffs also argue that Bass's behavior subsequent to its termination from the ACP manifested an intent to remain bound by the Agreements. Pls.' Summ. J. Br. 8-10. They assert that, "[i]n accordance with the terms of the CBA, Bass continued to submit remittance reports, remit contributions on behalf of its employees working in covered employment, and pay union-scale wages for covered work." They allege further that remittance reports submitted to the Funds "were each signed by a representative of Bass" and contained a declaration "declar[ing] that it is a party to a written agreement requiring contributions to the Plumbers and Pipefitters National Pension Fund." *Id.* at 8. Defendants contest these allegations. Fiduccia Aff. ¶ 6 ("[I]t is untrue that my company continued to submit remittance reports . . . ."); *id.* ("[A]ny report that is alleged to have been signed by a 'representative of Bass' is not signed by an officer of the company."). Defendants also counter that any contributions to the Funds after their termination from the ACP were "*de minimis*." Defs.' Opp'n Br. 4. While this is a genuine dispute of fact,

7

because Bass failed to withdraw from the Agreements in accordance with the contract terms and the legal standard for notification to the Union, *see supra* Part II(2), it is not material.

   4. **Fiduccia's Personal Liability**

Plaintiffs assert that Fiduccia is personally liable for Bass's delinquent contributions to the Funds because he breached his fiduciary duties to the Funds under ERISA. Pls.' Summ. J. Br. 10. Defendants do not offer any counter-argument on this point. *See generally* Defs.' Opp'n Br. A person is a fiduciary under ERISA, and thus individually liable for a corporation's delinquent ERISA contributions, if two conditions are met: First, the unpaid contributions must be defined as plan assets. Second, the person must possess or exercise "any" amount of discretionary authority or control respecting management of those plan assets. 29 U.S.C. § 1002(21)(A); *In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009).

Both conditions are satisfied here. First, the Funds' Trust Agreements expressly define plan assets to include money that is "due and owing to the Fund by the Employers as required by Collective Bargaining Agreements." Pls.' Rule 56.1 Statement ¶ 11; Saraceni Aff. Supp. Pls.' Order to Show Cause & TRO Ex. E, at 6; *id.* at Ex. F, at 6; *id.* at Ex. G, at 6; *id.* at Ex. I, at 5. Indeed, courts have repeatedly found that individual defendants were ERISA fiduciaries of precisely the same employee benefit plans at issue in this case—the Funds—because they exercised discretionary control over unpaid contributions to the Funds. *E.g.*, *Trustees of Plumbers Local Union No. 1 Welfare Fund v. Temperini Mech., Inc.*, No. 12 Civ. 05646 (ILG)(SMG), 2014 WL 2644774, at *4 (E.D.N.Y. June 13, 2014); *Trustees of Plumbers Local Union No. 1 Welfare Fund v. Manhattan Plumbing Corp.*, No. 08-CV-3036 (FB)(RML), 2010 WL 456870, at *2 (E.D.N.Y. Feb. 3, 2010).

Second, plaintiffs have put forth evidence sufficient to demonstrate that Fiduccia exercises discretionary control over the management of plan assets—namely, the money in Bass's possession that is owed to the Funds—and therefore qualifies as a fiduciary of the Funds. Fiduccia is the president and sole shareholder of Bass, Fiduccia Aff. ¶ 1, and the only licensed plumber affiliated with Bass, Epstein Aff. Ex. D. At a deposition conducted in December 2012 in connection with an earlier court action between the same parties, Fiduccia testified that he is the only person at Bass with the authority to determine which obligations Bass pays, Bishop Aff. Supp. Pls.' Order to Show Cause & TRO at ¶ 7; *id.* at Ex. A, at 18:22-25, a fact that the Second Circuit has considered significant in finding that an individual defendant was a fiduciary under ERISA. *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997). Fiduccia's discretionary authority over the unpaid benefit contributions in Bass's possession places him within the definition of a fiduciary under ERISA, which Congress intended "to be broadly construed." *Id.* (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987)).

Under 29 U.S.C. § 1009(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." As a fiduciary of the Funds, Fiduccia's personal liability includes unpaid contributions as well as interest, liquidated damages, attorney's fees, and costs. 29 U.S.C. § 1132(g)(2); *Manhattan Plumbing Corp.*, 2010 WL 456870, at *2.

### III. CONCLUSION

Plaintiffs' motion for summary judgment is granted. As a member of the ACP at the time of the Agreements' execution, Bass is bound by the contracts' terms and conditions. Because Bass failed to provide adequate notice to the Union of its withdrawal from the Agreements, in

violation of both the express contract terms and general legal standards, its termination from the ACP did not in any way alter its contractual obligations. In addition, as a person who exercises discretionary control over the management of unpaid benefit contributions in Bass's possession, Fiduccia is a fiduciary of the Funds and thus personally liable for Bass's delinquent contributions.

**SO ORDERED.**

Brooklyn, New York
December 8, 2014

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge